1   **ERICA K. ZUNKEL**
    California State Bar No. 229285
2   **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
    225 Broadway, Suite 900
3   San Diego, CA 92101-5008
    (619) 234-8467/Fax: (619) 687-2666
4   E-Mail: erica_zunkel@fd.org

5   Attorneys for Antonio De Leon-Arteaga

6

7                 UNITED STATES DISTRICT COURT

8              SOUTHERN DISTRICT OF CALIFORNIA

9              **(HONORABLE JOHN A. HOUSTON)**

10   UNITED STATES OF AMERICA,     )    Case No. 07CR3100-JAH
                              )
11          Plaintiff,            )    DATE:     March 17, 2008
                              )    TIME:     8:30 a.m.
12   v.                           )
                              )    STATEMENT OF FACTS AND
13   ANTONIO DE LEON-ARTEAGA,      )    MEMORANDUM OF POINTS AND
                              )    AUTHORITIES IN SUPPORT OF
14          Defendant.       )    DEFENDANT'S MOTIONS
    _____ )

15

16                         **I.**

17               **STATEMENT OF FACTS**

18         The following statement of facts is based on materials received from the government. Mr. De Leon

19   does not accept this statement of facts as his own, and reserves the right to take a contrary position at motion

20   hearings and trial. The facts alleged in these motions are subject to amplification and/or modification at the

21   time these motions are heard.

22         On October 21, 2007, Border Patrol Agent Morfin encountered an individual later identified as

23   Antonio De Leon-Arteaga in an area approximately three miles west of the Calexico Port of Entry. Mr. De

24   Leon allegedly made statements to agents regarding his entry into the United States. Agents arrested Mr. De

25   Leon and took him to the El Centro Border Patrol Station for processing. On November 14, 2007, the

26   government filed a one count indictment charging a violation of 8 U.S.C. § 1326 (attempted entry after

27   deportation).

28         These motions follow.

## II.

## MOTIONS TO DISMISS  THE INDICTMENT

**A.     Motion to Dismiss The Indictment Because it Fails to Allege All Elements of the Charged Offense.**

The indictment must be dismissed because the government has failed to properly allege all elements of the offense.  The Fifth Amendment requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . .."  Consistent with this Constitutional requirement, the Supreme Court has held that an indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." United States v. Carll, 105 U.S. 611, 612-13 (1881) (emphasis added).  It is black letter law that an indictment that does not allege an element of an offense, even an implied element, is defective, and should be dismissed.  See, e.g., Russell v. United States, 369 U.S. 749, 769-72 (1962); Stirone v. United States, 361 U.S. 212, 218-19 (1960); United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999); United States v. Keith, 605 F.2d 462, 464 (9th Cir. 1979).

In this case, the indictment charges a violation of Title 8, United States Code, Sections 1326(a) and (b).  In United States v. Salazar-Lopez, 506 F.3d 748 (9th Cir. 2007), the Ninth Circuit indicated that to be sufficient, an indictment charging a violation of section 1326(b) must allege either that the defendant has been previously removed subsequent to a conviction (i.e., for a misdemeanor, a felony, an aggravated felony, or a crime of violence), or it must allege a specific date of the prior removal.  In this case, the indictment only alleges that Mr. De Leon "was removed from the United States subsequent to January 9, 2004."  The indictment does not allege either that this removal occurred subsequent to a conviction or allege a specific date of the prior removal.  Therefore, because the indictment does not allege all elements of section 1326(b), the indictment must be dismissed.

**B.     Dismiss The Indictment Because it Violates Mr. De Leon's Right to Presentment.**

As a corollary to the above argument, the indictment should be dismissed because it violates Mr. De Leon's right to presentment.  Mr. De Leon has a Fifth Amendment right to have a grand jury pass upon those facts necessary to convict him at trial.  In the indictment, the government included the language:  "It is further alleged that defendant ANTONIO DE LEON-ARTEAGA was removed from the United States subsequent

to January 9, 2004."[1]  The indictment in this case violates Mr. De Leon's right to presentment in two ways. First, the language added by the government does not ensure that the grand jury actually found probable cause that Mr. De Leon was deported after January 9, 2004, as opposed to simply being physically removed from the United States.  Second, that the grand jury found probable cause to believe that Mr. De Leon was removed "subsequent to January 9, 2004" does not address the possibility that the government may at trial rely on a deportation that was never presented to, or considered by, the grand jury.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. Amend. V.  The Sixth Amendment provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . .."  U.S. Const. Amend. VI.  Thus, a defendant has a constitutional right to have the charges against him presented to a grand jury and to be informed of the grand jury's findings via indictment.  See Russell v. United States, 369 U.S. 749, 763 (1962) (An indictment must "contain[] the elements of the offense intended to be charged, and sufficiently apprise[] the defendant of what he must be prepared to meet.").

To be sufficient, an indictment must allege every element of the charged offense.  See United States v. Morrison, 536 F.2d 286, 287 (9th Cir. 1976) (citing United States v. Debrow, 346 U.S. 374 (1953)).  Indeed, in order to be sufficient, an indictment must include implied elements not present in the statutory language.  See Du Bo, 186 F.3d at 1179.  "If an element is necessary to convict, it is also necessary to indict, because elements of a crime do not change as criminal proceedings progress."  United States v. Hill, 279 F.3d 731, 741 (9th Cir. 2002).  An indictment's failure to "recite an essential element of the charged offense is not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment."  Du Bo, 186 F.3d at 1179.

In the indictment, the government here has added the language:   "It is further alleged that defendant ANTONIO DE LEON-ARTEAGA was removed from the United States subsequent to January 9, 2004."

---

[1]  Presumably, the government added this language in an attempt to comply with the Ninth Circuit's decision in United States v. Covian-Sandoval, 462 F.3d 1090 (9th Cir. 2006).  In Covian-Sandoval, the Ninth Circuit held that it is an Apprendi violation for a court to increase a person's statutory maximum under 8 U.S.C. § 1326(b) via a court-finding that a person had been removed from the United States following a conviction.  This language, however, does not cure the problems with this indictment.  Should sentencing become necessary, Mr. De Leon will file further briefing on this issue.

1   There is no indication from this "allegation" that the grand jury was charged with the legal meaning of the

2   word "removal" applicable in this context, as opposed to being simply removed from the United States in a

3   colloquial sense.  It is clear from <u>Covian-Sandoval</u> that in order to trigger the enhanced statutory maximum

4   contained in section 1326(b), the government must prove that a person was removed—as that term is used

5   in the immigration context—after having suffered a conviction. 462 F.3d at 1097-1098 (noting as part of its

6   analysis that immigration proceedings have fewer procedural protections that criminal proceedings).  A

7   deportation has the following elements: "(1) that a deportation proceeding occurred as to [the] defendant and

8   as a result, [(2)] a warrant of deportation was issued and [(3)] executed by the removal of the defendant from

9   the United States."  <u>See</u> <u>United States v. Castillo-Basa</u>, 483 F.3d 890 (9th Cir. 2007) (citing, without

10  contesting, the elements of a deportation provided by the district court).  As this is the type of removal the

11  government must prove before a petite jury, it is necessary that the government allege such a removal before

12  the grand jury.  As returned, however, there is no assurance from the face of the indictment that the grand jury

13  in this case was charged with the <u>type</u> of removal necessary to increase a person's statutory maximum under

14  section 1326(b).

15       As such, there is no fair assurance that the grand jury will have passed upon those facts necessary

16  to convict Mr. De Leon.  Additionally, as charged, there is no fair assurance that the indictment will contain

17  those allegations the government will attempt to prove at trial.  If the government alleged before the grand

18  jury that Mr. De Leon was removed (in a colloquial sense), but offers proof at trial that Mr. De Leon was

19  removed (in an immigration sense), there will be a constructive amendment of the indictment at trial.  <u>See</u>

20  <u>Stirone v. United States</u>, 361 U.S. 212, 217-19 (1960).  Either scenario represents a violation of Mr. De

21  Leon's right to presentment.  <u>Stirone</u>, 361 U.S. at 218-19.

22       A second problem with the indictment is that there is no indication which (if any) deportation the

23  government presented to the grand jury.  In most cases, the government will have a choice of deportations to

24  present to the grand jury to support an allegation that a person had been deported after a specific date.

25  According to information provided by the government, although not conceded by the defendant, Mr. De Leon

26  has been subjected several  removal proceedings.  This renders it a very real possibility that the government

27  alleged one deportation to the grand jury to sustain its allegation that Mr. De Leon was removed from the

28  United States, but will attempt to prove at trial a wholly different deportation to sustain its trial proof.  If this

1 | were to turn out to be the case, Mr. De Leon's right to have the grand jury pass on all facts necessary to convict

2 | him would be violated.  See Du Bo, 186 F.3d 1179.

3 | **III.**

4 | **MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT**

5 | The above arguments to dismiss the indictment based on the government's failure to comply with

6 | Mr. De Leon's Fifth and Sixth Amendment rights is premised on Covian-Sandoval having read into section

7 | 1326 an additional element—a deportation that occurred at a particular time—that the government must plead

8 | to the grand jury and prove to a jury.  To the extent the government argues that Covian-Sandoval did not

9 | create an additional element, the indictment contains surplusage.  In other words, if the government argues

10 | that the timing of a person's deportation is not a element of section 1326, but rather a sentencing factor under

11 | subsection (b) of section 1326, the indictment alleges a fact—the timing of a person's deportation—the

12 | Supreme Court has clearly held to be decided by a judge.

13 | The Ninth Circuit has "repeatedly held that language [in an indictment] that describes elements

14 | beyond what is required under statute is surplusage and need not be proved at trial."  Bargas v. Burns,

15 | 179 F.3d 1207, 1216 n. 6 (9th Cir. 1999).  Surplusage in an indictment is subject to being struck at the request

16 | of the defendant.  United States v. Fernandez, 388 F.3d 1199, 1220-21 (9th Cir. 2004).  In this case, if the

17 | government argues that the date of a person's deportation is not a required element of section 1326, the

18 | indictment contains language beyond that which is necessary to convict Mr. De Leon of violating section

19 | 1326.  If the date of a person's deportation is not an element of section 1326, then the language in the

20 | indictment—" "It is further alleged that defendant ANTONIO DE LEON-ARTEAGA was removed from the

21 | United States subsequent to January 9, 2004."—is surplusage.  So too is the government's allegation in the

22 | indictment that Mr. De Leon violated section 1326, subsection (b).

23 | At one time, the Ninth Circuit considered subsection (b) of section 1326 a separate offense from

24 | subsection (a).  See United States v. Corona-Sanchez, 291 F.3d 1201, 1203 (9th Cir. 2002) (en banc).  This

25 | changed, however, following the Supreme Court's decision in Almendarez-Torres v. United States,

26 | 523 U.S. 224 (1998).  See Corona-Sanchez, 291 F.3d at 1203.  In Almendarez-Torres, the Supreme Court

27 | decided that subsection (b) of section 1326 described a sentencing provision, to be determined by a judge,

28 | rather than a substantive offense.  See id.  Following Almendarez-Torres, the Ninth Circuit rethought the way

1  in which subsection (b) should be viewed, to the extent that indictments and judgements that reflect a

2  violation of both subsection (a) and subsection (b) of section 1326 should have the reference to subsection (b)

3  struck to "unambiguously reflect that the defendant was convicted of only one punishable offense

4  pursuant . . .." <u>Id.</u>

5       Although an allegation of a particular date of deportation would likely be an appropriate response

6  on the government's part to the holding of <u>Covian-Sandoval</u>, the government here has chosen to include in

7  the indictment an allegation that goes solely towards an allegation under subsection (b) of section 1326.

8  Indeed, the government has chosen to actually allege a violation of subsection (b) of section 1326 in the

9  indictment.  As <u>Almendarez-Torres</u> makes clear, however, Congress clearly intended findings under

10 subsection (b) of section 1326 to made by a judge, rather than a jury.  <u>Almendarez-Torres</u>, 523 U.S. at 235

11 ("we believe that Congress intended to set forth a sentencing factor in subsection (b)(2) and not a separate

12 criminal offense).

13      Although the Ninth Circuit is free to overrule its own precedent regarding whether Congress intended

14 a statutory provision to be decided by a judge, rather than a jury, <u>see, e.g.</u>, <u>United States v. Buckland</u>,

15 289 F.3d 558, 564-68 (9th Cir. 2002) (<i>en banc</i>) (discussing enhanced penalties under 21 U.S.C. § 841), it has

16 not seen fit to overrule the Supreme Court's decision in <u>Almendarez-Torres</u>.  <u>See, e.g.</u>, <u>United States v.</u>

17 <u>Weiland</u>, 420 F.3d 1062, 1079 n. 16 (9th Cir. 2005).  For these reasons, to the degree the government argues

18 that <u>Covian-Sandoval</u> did not create an additional element of section 1326, the government has pled in the

19 indictment an allegation that Congress intended to be decided by judge, rather than a jury.[2]  Therefore,

20 pursuant to Federal Rule of Criminal Procedure 7(d), Mr. De Leon moves to strike this surplusage from the

21 indictment.

22 / / /

23 / / /

24 _____

25     [2] The holdings in <u>Covian-Sandoval</u> and <u>Almendarez-Torres</u> also render subsection (b) of
section 1326 unconstitutional. In <u>Covian-Sandoval</u>, the Ninth Circuit held that a jury must determine

26 the timing of a person's deportation to trigger subsection (b)'s enhanced statutory maximum.
<u>Covian-Sandoval</u>, 462 F.3d 1097-1098. In <u>Almendarez-Torres</u>, however, the Supreme Court held

27 that Congress intended subsection (b) to be a sentencing provision to be determined by a judge.
<u>Almendarez-Torres</u>, 523 U.S. at 235.  It is thus clear that subsection (b), as written and construed

28 by the Supreme Court, violates <u>Apprendi</u>.

**IV.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. GONZALEZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury. That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[3] These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[4]

**1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. B at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id.

---

[3] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[4] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Mr. De Leon requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[5] See also id. at 20 ("You're all about probable cause.").

1    at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

2    judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

3    though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

4    be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

5    because the grand jurors disagree with a proposed prosecution.

6        Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

7    to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

8        I've gone over this with a couple of people.  You understood from the questions and
         answers that a couple of people were excused, I think three in this case, because they could
9        not adhere to the principle that I'm about to tell you.

10   Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

11   disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

12   view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

13       Examination of the recently disclosed voir dire transcript, which contains additional instructions and

14   commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

15   reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists

16   and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

17   merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his

18   earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause

19   determination.

20       [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
         crime was committed?  And second, do we have a reasonable belief that the person that
21       they propose that we indict committed the crime?"

22       If the answer is "yes" to both of those, then the case should move forward.  If the answer
         to either of the questions is "no," then the grand jury should not hesitate and not indict.
23

24   See Ex. C at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

25   term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

26   addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

27   committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

28   crime."

1    Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

2    in some unknown set of circumstances, they might decline to indict even where there was probable cause.

3    Because of the redactions of the grand jurors' names, Mr. De Leon will refer to them by occupation.  One is

4    a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The

5    CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

6    an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration

7    cases.  See id.

8    Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

9    CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

10   district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

11   Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

12   simply not capable of expression in the context of grand jury service.

13   Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as
     the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to

14   a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States
     entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I*

15   *wouldn't want you to say,* "well, yeah, there's probable cause, but I still don't like what our
     government is doing.  I disagree with these laws, so I'm not going to vote for it to go

16   forward." If that is your frame of mind, the probably you shouldn't serve.  Only you can tell
     me that.

17

18   See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

19   juror know that he would not want him or her to decline to indict in an individual case where the grand juror

20   "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See id.

21   Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

22   manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

23   charge even if [the CSW] thought the evidence warranted it." See id.  Again, Judge Burns's question provided

24   no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small

25   amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror

26   listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

27   them to vote "no bill" in the face of a showing probable cause.

28   / / /

9

1    Just in case there may have been a grand juror that did not understand his or her inability to exercise

2  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

3  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

4  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

5  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

6  considerations into account.

7         Well, those things -- the consequences of your determination shouldn't concern you in the
        sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
8         cannot consider the punishment or the consequence that Congress has set for these things.
        We'd ask you to also abide by that.  We want you to make a business-like decision of
9         whether there was a probable cause. . . .

10  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

11  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

12    In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

13  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

14  juror is obligated to vote to indict if there is probable cause.

15         I can tell you sometimes I don't agree with some of the legal decisions that are indicated
        that I have to make.  But my alternative is to vote for someone different, vote for someone
16         that supports the policies I support and get the law changed.  It's not for me to say, "well,
        I don't like it.  So I'm not going to follow it here."
17
        You'd have a similar obligation as a grand juror even though you might have to grit your
18         teeth on some cases.  Philosophically, if you were a member of congress, you'd vote
        against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote
19         against criminalizing some drugs.

20         That's not what your prerogative is here.  You're prerogative instead is to act like a judge
        and say, "all right.  This is what I've to  deal with objectively.  Does it seem to me that a
21         crime was committed?  Yes.  Does it seem to me that this person's involved?  It does." And
        then your obligation, if you find those to be true, would be to vote in favor of the case going
22         forward.

23  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if both

24  questions are answered in the affirmative, lead to an "obligation" to indict.

25    Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

26  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

27  to indict in every case in which there was probable cause.

28  / / /

1    The Court: Do you think you'd be inclined to let people go in drug cases even though you
     were convinced there was probable cause they committed a drug offense?
2    REA: It would depend on the case.
     The Court: Is there a chance that you would do that?
3    REA: Yes.
     The Court: I appreciate your answers.  I'll excuse you at this time.

4

5    Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

6    political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

7    should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

8    indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge Burns

9    made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

10   hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

11   because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[6]

12   See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great

13   a risk to run.

14       **2.      The Instructions Posit a Non-Existent Prosecutorial Duty to Offer
                   Exculpatory Evidence.**

15

16       In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

17   grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex.

18   B at 20.[7]

19   _____

20       [6] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate
     judge will have determined the existence of probable cause "in most circumstances" before it has
21   been presented with any evidence.  See Ex. B at 6.  This instruction created an imprimatur of finding
     probable cause in each case because had a magistrate judge not so found, the case likely would not
22   have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it
     merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction
23   made the grand jury more inclined to indict irrespective of the evidence presented.

24
         [7] These instructions were provided in the midst of several comments that praised the United
25   States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they
     "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be
26   honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. B at 27.  The
     instructions delivered during voir dire go even further.  In addressing a prospective grand juror who
27   revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. C at 38,
     Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even
28   while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense

1    Now, again, this emphasizes the difference between the function of the grand jury and the
     trial jury. You're all about probable cause. If you think that there's evidence out there that
2    might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
     you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
3    *duty-bound to present evidence that cuts against what they may be asking you to do if*
     *they're aware of that evidence.*

4

5    Id. (emphasis added).

6    The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7    "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. C at 14, Judge Burns

8    gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9    adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus,

10   Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

11   "adverse" or "that cuts against the charge." See id.

12   **B.    *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers**
     **of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole**
13   **During Impanelment.**

14   The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

15   grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

16   _____

17   to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith
     to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict
18   innocent people or people that they believe to be innocent or the evidence doesn't substantiate the
     charges against.").
19

20   Judge Burns's discussion of his once having been a prosecutor before the Grand Jury
     compounded the error inherent in his praising of the government attorneys. See Ex. B at 9-10.
21   Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id.
     at 8, he would not allow the government attorneys to act inappropriately or to present cases for
22   indictment where no probable cause existed.

23
     In addition, while Judge Burns instructed the Grand Jury that it had the power to question
24   witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the
     U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be
25   asked." See Ex. C at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's
     independence is diluted by [such an] instruction, which encourages deference to prosecutors."
26   Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice,"
     see Ex. B at 12, does not cure the error as courts regularly presume grand jurors follow instructions
27   provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow
     instructions because, in fact, we are prohibited from examining jurors to verify whether they
28   understood the instruction as given and then followed it.").

1  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

2  approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

3  the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand

4  jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January

5  2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

6  bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

7  exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

8  States v. Williams, 504 U.S. 36, 49 (1992).

9         For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

10  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

11  deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

12  as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

13  (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

14  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

15  prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

16  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

17  also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

18  prosecutor." Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of

19  the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

20  "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

21  that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

22  § 15.2(g) (2d ed. 1999)).

23         Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

24  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

25

26  ───────────────

27         [8]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
    majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28  imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
    constitutional independence.").

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts.  And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.  But not in Judge Burns's instructions.

**C.      Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both _Vasquez_ and _Navarro-Vargas II_.**

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." <u>See</u> Ex. C at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." <u>Vasquez</u>, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, <u>see</u> Ex. C at 4, 8, n context, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not indict." <u>See id.</u> at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1205. Clearly he was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the <u>Navarro-Vargas</u> spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

<u>See</u> Ex. C at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1205 (citing <u>Marcucci</u>, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. <u>See, e.g.</u>, <u>United States v. Calandra</u>, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

/ / /

1    By the same token, if Judge Burns said that "the case should move forward" if there is probable

2    cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

3    Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

4    two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

5    been his intent.  But even if it were, no grand jury could ever have had that understanding.[9]  Jurors are not

6    presumed to be capable of sorting through internally contradictory instructions.  See generally United States

7    v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

8    presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

9    Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

10   clear to the grand jurors that "should" was not merely suggestive, but obligatory:

11   **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire

12   and excused a potential juror (CSW):

13   > The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
   > you to say, "Well, yeah, there's probable cause.  But I still don't like what the government

14   > is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's
   > your frame of mind, then probably you shouldn't serve.  Only you can tell me that.

15   > Prospective Juror: Well, I think I may fall in that category.
   > The Court: In the latter category?

16   > Prospective Juror: Yes.
   > The Court: Where it would be difficult for you to support a charge even if  you thought the

17   > evidence warranted it?
   > Prospective Juror: Yes.

18   > The Court: I'm going to excuse you then.

19   See Ex. C at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

20   juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

21   "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I

22   wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

23   was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

24   the exercise of discretion by any other prospective grand juror.

25

26   _____

27       [9]  This argument does not turn on Mr. Gonzalez's view that the Navarro-Vargas/Marcucci
     reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the

28   context in which the word is employed by Judge Burns in his unique instructions, context which
     eliminates the Navarro-Vargas/Marcucci reading as a possibility.

**(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

Court    . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward*.

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

**(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

**(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

1  reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

2  that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what

3  the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. B at 9.

4        Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

5  penalties to which indicted persons may be subject.

6        Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case
         is about because there is a disparity between state and federal law.
7        The Court:  In what regard?
         Prospective Juror: Specifically, medical marijuana.
8        The Court:  Well, those things -- the consequences of your determination shouldn't concern
         you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of*
9        *course, that they cannot consider the punishment or the consequence that Congress has set*
         *for these things. We'd ask you to also abide by that.* We want you to make a business-like
10       decision of whether there was a probable cause. ...

11  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

12  would obviously leave no role for the consideration of penalty information.

13        The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

14  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

15  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

16  reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

17  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

18  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized

19  consideration of penalty information.  See 474 U.S. at 263.

20        Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

21  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

22  was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

23  contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

24  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

25  Vasquez:

26        The grand jury does not determine only that probable cause exists to believe that a
         defendant committed a crime, or that it does not.  In the hands of the grand jury lies the
27       power to charge a greater offense or a lesser offense; numerous counts or a single count;
         and perhaps most significant of all, a capital offense or a non-capital offense – all on the
28       basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case
         where a conviction can be obtained."

1   474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

2   dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

3   initial decision to indict, but also significant decisions such as how many counts to charge and whether to

4   charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor

5   would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u>

6   <u>id.</u> at 264. Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury. The instructions therefore represent

7   structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

8   jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must

9   therefore be dismissed. <u>Id.</u>

10          The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

11   instructions excesses. The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

12   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

13   408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand

14   jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at

15   1202 (emphases in the original).

16          Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

17   'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

18   of many of its decisions -- sufficiently protects that power." <u>See id.</u> at 1214 (Hawkins, J., dissenting). The

19   flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

20   making a probable cause determination ... unconstitutionally undermines the very structural protections that

21   the majority believes save[] the instruction." <u>Id.</u> After all, it is an "'almost invariable assumption of the law

22   that jurors follow their instructions.'" <u>Id.</u> (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)). If that

23   "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

24   in <u>Vasquez</u>. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

25   instructions because nothing will happen if they disobey them." <u>Id.</u>

26          In setting forth Judge Hawkins' views, Mr. Gonzalez understands that this Court may not adopt them

27   solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

28   Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

1  Here, again, the question is not an obscure interpretation of the word "should", especially in light of

2  the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

3  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the

4  right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

5  Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

6  Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

7  they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

8  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  See Ex.

9  B at 8; Ex. C at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden

10  grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

11  of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

12  exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government

13  by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 &

14  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

15  initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge

16  Burns has both fashioned his own rules and enforced them.

17  **D.     The Instructions Conflict with Williams' Holding That There Is No Duty to Present**
   **Exculpatory Evidence to the Grand Jury.**

18

19  In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

20  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

21  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

22  common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory'

23  judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority

24  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

25  amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

26  Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does

27  not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id. at 47

28  (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own initiative,

1  rules of grand jury procedure." Id. at 50.  As a consequence, Williams rejected the defendant's claim, both

2  as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

3        Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

4  present to them evidence that tended to undercut probable cause.  See Ex. B at 20.

5        Now, again, this emphasizes the difference between the function of the grand jury and the
        trial jury. You're all about probable cause.  If you think that there's evidence out there that
6        might cause you say "well, I don't think probable cause exists," then it's incumbent upon
        you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*
7        *duty-bound to present evidence that cuts against what they may be asking you to do if*
        *they're aware of that evidence.*

8

9  Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

10  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

11  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

12  id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See

13  Navarro-Vargas, 408 F.3d at 1207.

14        This particular instruction has a devastating effect on the grand jury's protective powers, particularly

15  if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

16  conveyed by the previous instruction: "You're all about probable cause." See Ex. B at 20.  Thus, once again,

17  the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

18  probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

19  would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

20  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

21  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

22  cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

23  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

24  you to do if they're aware of that evidence." See id.  Moreover, during voir dire, Judge Burns informed the

25  jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that

26  cuts against the charge, you'll be informed of that.  *They have a duty to do that*." See Ex. C at 14-15

27  (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the

28  "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from

1  of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

2  Ex. B at 27.

3      These instructions create a presumption that, in cases where the prosecutor does not present

4  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

5  exculpatory evidence was presented, would proceed along these lines:

6      (1)    I have to consider evidence that undercuts probable cause.

7      (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

8             evidence to me, if it existed.

9      (3)    Because no such evidence was presented to me, I may conclude that there is none.

10  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

11  presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

12  prosecutor would have presented it.

13      The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

14  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

15  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

16  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

17  the Fifth Amendment.

18                                      **V.**

19                        **MOTION TO SUPPRESS STATEMENTS**

20      Mr. De Leon moves to suppress any statements made by him on the grounds of an invalid Miranda

21  waiver and voluntariness.

22  **A.    The Government Must Demonstrate Compliance with _Miranda_.**

23      In order for any statements made by Mr. De Leon to be admissible against him, the government must

24  demonstrate that they were obtained in compliance with the Miranda decision. The government must establish

25  that Mr. De Leon's waiver of his Miranda rights was voluntary, knowing, and intelligent.  See Schneckloth

26  v. Bustamonte, 412 U.S. 218 (1973).  When interrogation continues without the presence of an attorney, and

27  a statement results, the government has a heavy burden to demonstrate that the defendant has intelligently and

28  voluntarily waived his privilege against self-incrimination.  Miranda, 384 U.S. at 475.  The court must indulge

1  every reasonable presumption against waiver of fundamental constitutional rights, so the burden on the

2  government is great.  United States v. Heldt, 745 F. 2d 1275, 1277 (9th Cir. 1984).

3  In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality

4  of the circumstances surrounding the case.  Edwards v. Arizona, 451 U.S. 477 (1981); United States v.

5  Garibay, 143 F.3d 534 (9th Cir. 1998).  The Ninth Circuit has held that determination of the validity of a

6  Miranda waiver requires a two prong analysis:  the waiver must be both (1) voluntary and (2) knowing and

7  intelligent.  Derrick v. Peterson, 924 F. 2d 813 (9th Cir. 1990).  The second prong requires an inquiry into

8  whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and

9  the consequences of the decision to abandon it."  Id. at 820-821 (quoting Colorado v. Spring, 479 U.S. 564,

10  573 (1987)).  Not only must the waiver be uncoerced, then, it must also involve a "requisite level of

11  comprehension" before a court may conclude that Miranda rights have been legitimately waived.  Id. (quoting

12  Colorado v. Spring, 479 U.S. at 573).  Unless and until Miranda warnings and a knowing and intelligent

13  waiver are demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

14  against the defendant.  Miranda, 384 U.S. at 479.  The government in this case must prove that Mr. De Leon

15  waived his rights intelligently and voluntarily.  Mr. De Leon disputes any allegation any waiver was knowing,

16  intelligent, and voluntarily.

17  **B.      Mr. De Leon's Statements Must Be Voluntary.**

18  Even if this Court determines that Mr. De Leon validly waived his Miranda rights, it must still make

19  a determination that any statements are voluntary.  Under 18 U.S.C. § 3501(a), this Court is required to

20  determine, whether any statements made by Mr. De Leon are voluntary.  In addition, section 3501(b) requires

21  this Court to consider various enumerated factors, including whether Mr. De Leon understood the nature of

22  the charges against him and whether he understood his rights.  Without such evidence, this Court cannot

23  adequately consider these statutorily mandated factors.

24  Moreover, section 3501(a) requires this Court to make a factual determination.  Where a factual

25  determination is required, Fed. R. Crim. P. 12 obligates courts to make factual findings.  See United States

26  v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important

27  as the trial itself,'" id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be

28  / / /

supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

### VI.

### <u>REQUEST FOR LEAVE TO FILE FURTHER MOTIONS</u>

Mr. De Leon has received 45 pages of discovery.  As new information surfaces due to the government providing discovery in response to these motions, or an order of this Court, defense may find it necessary to file further motions, or to supplement existing motions with additional facts.  The denial of this motion will result in a violation, at a minimum, of Mr. De Leon's Fifth and Sixth Amendment rights. Therefore, defense counsel requests the opportunity to file further motions based upon information gained from discovery.

### VII.

### <u>CONCLUSION</u>

For the reasons stated above, Mr. De Leon requests this Court grant his motions.

Respectfully submitted,

DATED:        March 5, 2008                    _/s/ Erica K. Zunkel_____
                                               ERICA K. ZUNKEL
                                               Federal Defenders of San Diego, Inc.
                                               Attorneys for Mr. De Leon
                                               erica_zunkel@fd.org